

**FILED**

# ORIGINAL

SEP 2 8 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Case No.: |
| SALVADOR CHAVARRIA, GLENN D. LEFTWICH, and JOHN A. NIETO | § § § § | **A07CA 820LY** |
| Defendants. | § § | |

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Salvador Chavarria, Glenn D. Leftwich and John A. Nieto ("Defendants") alleges and states that:

### SUMMARY

1.    Between July 25, 2005 and November 1, 2005, Defendants, while employed by Dell, Inc., engaged in unlawful insider trading by purchasing and selling Dell options while in possession of material nonpublic information, in breach of a fiduciary duty owed to Dell's shareholders. In the course of their duties, Defendants obtained material nonpublic information about Dell's financial performance and thereafter purchased Dell put options prior to public release of the information. The price of the company's stock declined sharply following the disclosure of the information, and the Defendants each profited from their illegal trading by selling the Dell put options shortly after release of the information to the public.

### JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act"), Section 21A of the Securities Exchange Act of 1934

("Exchange Act"), and 28 U.S.C. § 1331.  Each Defendant, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, practices and courses of business described in this Complaint. Venue is proper in this Court, under Section 27 of the Exchange Act, because many of the transactions, acts, practices and courses of business described below occurred within the jurisdiction of the Western District of Texas.

## PARTIES

3.      The Commission is the United States governmental agency responsible for enforcing the federal securities laws for the protection of investors.

4.      Defendant Salvador Chavarria, age 38, is a resident of Austin, Texas.  Chavarria was a Senior Finance Manager in Dell's Americas Business Unit Preferred Account Division, at Dell's Round Rock, Texas headquarters at the time of the acts alleged in this Complaint.

5.      Defendant Glenn D. Leftwich, age 38, is a resident of Las Vegas, Nevada. Leftwich was a Senior Finance Consultant in Dell's Americas Business Unit Planning Division at Dell's Round Rock, Texas headquarters at the time of the acts alleged in this Complaint.

6.      Defendant John A. Nieto, age 35, is a resident of Round Rock, Texas.  Nieto was, during the relevant, and is currently, a Senior Finance Manager in ABU Planning, at the company's Round Rock headquarters.

## STATEMENT OF FACTS

### Dell Americas Business Unit (ABU) Segments

7.      Dell manages its global business through three geographic units:  ABU (North and South America); EMEA (Europe, the Middle East, and Africa); and APJ (Asia Pacific and Japan).  ABU's revenues and operating income routinely comprise over half the total revenues and operating income for Dell as a whole in a given quarter, and, for the second and third quarters fiscal year 2006, ABU comprised approximately 53% of Dell's total revenues and more

than 65% of Dell's total operating income.  During the second and third quarters of fiscal year 2006, ABU was comprised of seven business segments and three finance segments.

8.      ABU's business segments essentially divide up the unit's sales markets, and, in fiscal year 2006 included the Corporate Business Group, Small and Medium Business, ABU Preferred Account Division (PAD), Education, Healthcare, Federal Group, and State & Local Government.  ABU PAD, then and now, primarily serves corporate customers with 500 to 2,000 employees.

9.      For the second quarter fiscal year 2006, ABU PAD generated approximately $536 million in revenues, or approximately 6% of ABU's $8.9 billion in revenues, or 4% of Dell's $13.4 billion in total revenues.  ABU PAD's operating income comprised approximately 10% of ABU's operating income during this same period, and 7% of Dell's total operating income during this same period.

10.      ABU finance segments are ABU Accounting, ABU Planning, and ABU Reporting.  Together, the three finance segments perform the finance and accounting functions for ABU's seven business segments.  ABU Planning is primarily responsible for comparing ABU's forecasted figures with its actual results.  In this role, ABU Planning creates financial plans for upcoming quarters or fiscal years, using both actual results and estimates of future results from the other ABU segments.

### Nieto's Role within ABU Planning

11.      Nieto, as ABU Planning's Senior Finance Manager, has overseen and managed the work of ABU Planning since mid-2004.  Nieto supervises four employees, including Leftwich from May 2005 to January 2006.  Nieto's responsibilities include formulating financial plans for each fiscal year quarter.  He formulates these plans by comparing the forecasted revenue and operating income figures developed in the prior quarter to the results of the current quarter.  Accordingly, Nieto has regular access to ABU's forecasts for a given quarter and its

current revenues and profit margins.  During weeks six, ten, and twelve of each quarter, Nieto
reports the financial plans – essentially forecast versus actual – to various managers at Dell.

### Leftwich's Role within ABU Planning

12.      Leftwich, as a Senior Finance Consultant in ABU Planning from May 2005 to
January 2006, was responsible for analyzing and summarizing ABU's financial forecast, *i.e.*,
comparing actual financial results to the forecast (including revenue).  Leftwich was also
responsible for preparing slide presentations analyzing, summarizing, and supporting ABU's
forecast and outlook figures at periodic meetings with ABU general managers at the end of
weeks six, ten, and twelve of each quarter and at meetings with ABU's Finance Controller at the
end of week twelve.  As part of this work, Leftwich assisted with the analysis and comparison of
the forecast or outlook numbers to the actual numbers every quarter close week.  He was also
responsible for explaining to ABU general managers the difference between the forecast/outlook
figures and the actual results.  Leftwich necessarily had access to ABU's forecast and outlook
numbers and actual results throughout any given quarter.

### Chavarria's Role within ABU PAD

13.      Chavarria, as Senior Finance Consultant and Sales Controller of ABU PAD from
March 2000 to January 2006, was primarily responsible for setting quotas and compensation and
providing analysis to support the division.  He was responsible for ensuring that operating
expenses and the individuals within the sales organization were accounted for properly in the
periodic forecasts.  He also was responsible for producing reports for the sales team so ABU
PAD could hit its quarterly sales and revenue targets.  Additionally, Chavarria assisted with
ABU PAD's monthly financial review, in which the division produced a financial report
comparing performance in the current period to the forecast for that period.  Chavarria was solely
responsible for the operating expenses portion of the monthly financial review, and, as part of

this month-end work, he also was aware of ABU PAD's overall revenue and operating income figures and results compared to forecast.

### Leftwich and Nieto Learn of the ABU Second Quarter 2006 Revenue Miss and Purchase Put Options

14.   During the week of July 18, 2005 (week twelve of Dell's second quarter fiscal year 2006), Leftwich analyzed ABU's quarter-end results for the second quarter fiscal year 2006 and prepared summary materials for the meeting with ABU's Finance Controller.  During the last week of Dell's second quarter, beginning Monday, July 25, 2005, Leftwich worked on a "to-go" analysis, which compared actual revenue and operating income financial results to the forecast or outlook numbers.  On July 25, 2005, Leftwich purchased one Dell August put (strike price $40) for $46.74; the market price of Dell stock at close of that day was $41.28.  The next day, July 26, 2005, Leftwich purchased 105 Dell August puts (strike price $42.50) for $16,364.74, or almost 20% of his 2005 gross salary; the market price of Dell stock at the close of that day was $41.31.

15.   On August 1, 2005, Leftwich e-mailed to Nieto and others a report and attached file summarizing the ABU revenue and margin adjustments to the forecasted figures for the quarter.  The next day, August 2, 2005, Leftwich e-mailed to Nieto a spreadsheet containing the second quarter fiscal year 2006 ABU revenue and margin projections.  This spreadsheet indicated that ABU missed its revenue projection by $43.2 million (almost 1%) and its gross margin projection by $39.9 million (approximately 4%) for the second quarter fiscal year 2006.

16.   A few days later, on August 8, 2005, Leftwich purchased an additional 300 Dell August puts (strike price $37.50) for $4,735.99.  The next day, on August 9, 2005, Nieto bought 200 Dell August puts (strike price $37.50) for $5,160.99.  The market price of Dell stock at close on August 8 and 9 was, respectively, $39.72 and $39.88.  At the time he purchased these puts, he had access to and was aware of ABU's quarterly results and understood that of Dell's three geographic units, ABU was the most significant, in terms of Dell's financial results.  And, on

August 11, 2005, only a few hours before Dell's scheduled analyst conference call, Leftwich purchased another 200 Dell August puts (strike price $35.00) for $2,160.99.

### Chavarria Learns of the ABU PAD and ABU Second Quarter 2006 Revenue Miss and Purchases Put Options

17.     During the first week of August 2005, Chavarria helped create and was aware of financial data indicating that ABU PAD would miss its quarterly targets for revenues.  That same week, Chavarria received financial data indicating that segments comprising roughly half of ABU's total revenues would miss the second quarter fiscal year 2006 revenue forecast.  Specifically, Chavarria received two emails, with attached financial data:  the first, dated August 1, 2005, indicated that ABU's Americas Desktop segment, which accounted for 37% of ABU's consolidated revenue for the second quarter, would miss its revenue forecast; and a second, dated August 3, 2005, indicated that ABU's overall server business, which accounted for 9% of ABU's consolidated revenue for the second quarter, would miss its revenue forecast.  The 46% of ABU's consolidated revenue represented by these two segments includes portions of the entire PAD revenue miss (8% of ABU's consolidated revenue for the second quarter) known to Chavarria, so, in the end, Chavarria was aware that at least 46%, but not more than 54%, of ABU would miss the revenue forecast for the quarter.

18.     Further, in early August 2005, Chavarria discussed Dell's overall results for the quarter with other Dell finance employees working outside ABU PAD.  On the morning of Thursday, August 11, 2005, Chavarria purchased 300 Dell August puts (strike price $40.00) for $30,384.99.  That same morning, Chavarria purchased another 300 Dell August puts (strike price $40.00) for $37,594.98 -- this time in his wife's securities account.  The price of Dell stock at close on August 11 was $39.58.  The cost of these purchases constituted approximately 56% of Chavarria's 2005 gross salary.

### Dell Announces its Second Quarter 2006 Revenue Miss; Nieto, Leftwich, and Chavarria Sell their Put Options

19.     On August 11, 2005, at 4:00 p.m. CST, Dell stock closed at $39.58, on volume of almost 37 million shares.   Shortly thereafter, Dell senior management conducted an analyst conference call to discuss the company's second quarter fiscal year 2006 results.   During the call, Dell management announced that although Dell met its second quarter 2006 targets for earnings and EPS, the company's revenues for this period had fallen short 1.5% to 2.9% of earlier guidance and analysts' expectations.   From the outset of the question and answer portion of the call, analysts focused on Dell's revenue miss, as Dell had not suffered a revenue miss in at least the prior five quarters.   Dell management attributed much of the revenue shortfall to the company's "misexecution" with ABU – Dell had lowered its selling prices in an attempt to gain market share, but the increased sales were not enough to offset the lowered prices.

20.     On August 12, 2005, the day after Dell announced its revenue miss and held the analyst call, the company's stock price closed at $36.64, a drop of (7.4%) from the previous day's close, on volume of almost 97 million shares, an increase of 163% from the previous day. That same day, August 12, 2005, Leftwich sold 406 of his Dell August puts for $104,128.14 and Nieto sold all 200 of his Dell August puts for $21,838.09.   Nieto made a net profit of $16,677.10. Also, on August 12, 2005, Chavarria sold all 600 of the Dell August puts he had purchased in his and his wife's brokerage accounts the day before.   Chavarria received $221,220.74, and realized a net profit of $153,240.77.   The next trading day, Monday, August 15, 2005, Dell's stock price remained depressed at $36.58, and Leftwich sold his remaining 200 August puts for a loss of ($1,322.03).   Leftwich made a total net profit of $81,658.64 on the August sales.

**Leftwich Learns of Dell's Third Quarter 2006 Earnings Miss and
Purchases Put Options**

21.     Leftwich's duties required his familiarity with ABU's outlook/forecast figures, as well as knowledge of actual results relevant to the quarterly outlook and the Dell forecast established much earlier in the quarter.  During the last week of third quarter 2006, on October 26, 2005, Leftwich transmitted to Nieto and another ABU finance manager a detailed e-mail explaining that ABU's margin was running ($15) million or (1.3%) below the outlook for third quarter fiscal year 2006.

22.     Two days later, and only one business day before a scheduled Monday earnings announcement by Dell, Leftwich purchased 75 Dell November puts (strike price $30) for $5,692.24.  The day of the purchase, October 28, 2005, Dell's stock price closed at $31.06.  On October 31, 2005, only hours before the earnings announcement, Leftwich purchased 205 Dell November puts (strike price $30.00) for $12,425.73 and 75 Dell November puts (strike price $32.50)  for $10,122.24.    In  the  three-day  period  preceding  Dell's  negative  earnings announcement, Leftwich purchased puts totaling almost 31% of his 2005 gross salary.

**Dell Announces its Third Quarter 2006 Earnings Miss;
Leftwich Sells his Put Options**

23.     On October 31, 2005, Dell stock closed at $31.88, on volume of more than 23 million shares.  That same day, after close, Dell announced that the company was lowering its third quarter earnings guidance due to a shortfall in the U.S. (ABU) consumer business and U.K. operations.

24.     On November 1, 2005, after Dell's negative earnings announcement, its stock price closed at $29.24, down (8.3%) from the previous day's close, on volume of more than 105

million shares, a 349% increase from the previous day. That same day, November 1, 2005, Leftwich sold all 355 of the November puts he had purchased prior to the October 31, 2005 announcement. He realized a profit of $24,769.32.

### Leftwich, Nieto, and Chavarria were Aware of Dell's Insider Trading Prohibition

25.     Prior to engaging in the options transactions discussed above, Nieto, Leftwich, and Chavarria had each certified their understanding of, and agreed to abide by, Dell's Code of Conduct. Included in Dell's Code of Conduct is an Insider Trading policy, which specifically prohibits employees from trading or influencing trading while in possession of "inside information." The Insider Trading policy broadly defines "inside information" as "something that you may know as a Dell employee that people outside of the company may not know." The policy also states more specifically that "inside information" includes "unannounced financial data." Further, Dell's Insider Trading policy states that "Dell employees who work with confidential information are *sometimes* placed on the Trading Window List" (emphasis added), but "[r]egardless of whether [the employee] is placed on the Trading Window List, [the employee] should refrain from using any material inside information about Dell" to trade any stock.

### FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

26.     Paragraphs 1 through 25 above are re-alleged, and incorporated herein by reference.

27.     Each Defendant, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails has:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

28.     Each Defendant was a Dell employee when he traded in Dell securities while in possession of material nonpublic information. Each Defendant owed Dell's shareholders a duty of trust and confidence, which required him to disclose the material nonpublic information before selling Dell stock, or to abstain from trading.

29.     Each Defendant intentionally, knowingly or with severe recklessness made the untrue statements and omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

30.     By reason of the foregoing, each Defendant violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Permanently enjoin Defendants Chavarria, Leftwich and Nieto from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

### II.

Order each Defendant to disgorge all profits obtained by the unlawful trading alleged herein, plus prejudgment interest;

### III.

Order each Defendant to pay civil penalties under Section 21A of the Exchange Act; and

IV.

Grant such other relief, as this Court may deem just and appropriate.

Respectfully submitted,

Stephen J. Korotash
Oklahoma Bar No. 5102
U.S. Securities and Exchange
Commission
801 Cherry Street, 19th Floor
Fort Worth, TX 76102
817-978-6490

Of Counsel:
Will J. Fergus
New Jersey Bar
U.S. Securities and Exchange Commission
801 Cherry Street, 19th Floor
Fort Worth, TX 76102
817-978-6479